UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| ELIZABETH DEICH-KEIBLER and LARRY K. HALER, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) CAUSE NO. 4:04-CV-00005-SEB-WGH ) |
| BANK ONE and RBC MORTGAGE COMPANY, | ) ) ) ) |
| Defendants. | ) |

# E N T R Y

**Defendants' Motion for Summary Judgment (doc. no. 33)**
**Plaintiffs' Cross-Motion for Summary Judgment (doc. no. 41)**

This Cause comes before the Court on the parties' cross-motions for summary judgment. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). If a case is not entirely adjudicated on summary judgment, then a partial summary judgment may be entered on the issue of liability alone, *id.*, or an order may be issued specifying the facts not in material dispute, Fed. R. Civ. P. 56(d).

Plaintiffs Elizabeth Deich-Kiebler and Larry K. Haler were employed by defendant Bank One, NA (now JPMorgan Chase Bank) in its brokered mortgage loan sales division ("division") handling the Kentucky and southern Indiana regions respectively. In 2003, Bank One

discontinued its brokered mortgage loan sales business and sold and leased certain of its division's assets to defendant RBC Mortgage Company. RBC had expressed interest in acquiring the division's sales staff as well. On June 15, 2003, Bank One terminated the plaintiffs in connection with the sale of the division. As part of the deal, Bank One agreed with RBC to not employ or solicit any former division employee for a period of six months from the effective dates defined in the agreement. Asset Purchase Agreement ("Agreement"), ¶ 3.10(b); Bank One Responses to Plaintiffs' First Interrogatories, no. 2. Pursuant to an agreement with Bank One, RBC offered jobs to the division employees, including the plaintiffs. The plaintiffs declined the job offers and sought severance benefits from Bank One instead. Both plaintiffs found alternate employment.

Bank One had in effect at the time of the plaintiffs' terminations, a Pay Continuation Plan ("Plan"), as amended and restated effective January 1, 2003, which provided for temporary continuation of certain benefits and pay (severance pay) following termination of employment. Under the terms of the Plan, the Plan Administrator "makes the rules and regulations necessary to administer the Plan" and has "the responsibility and the sole discretionary authority to control the operation and administration of the Plan, including without limitation, the power to interpret the terms of this Plan, to make any finding of fact necessary or appropriate for any purpose under the Plan, to determine eligibility for benefits, and to determine the amount of such benefits . . . ." Summary Plan Description ("SPD"), p. 11. The SPD also provides that "[t]he interpretations and determinations of the Plan Administrator shall be final and binding." *Id.*

The Plan contained the follow provision:

> You will not be eligible for benefits under the Plan if any of the following apply:
>
> \* \* \*
>
> - You are offered employment with a **Successor Employer** as a result of an arrangement or agreement between Bank One and the **Successor Employer** (e.g., sale of business, outsourcing situation) or otherwise experience no employment loss in such situation . . . .

SPD, pp. 5-6. The Plan defines a Successor Employer as "any entity that assumes operations or functions formerly carried out by Bank One, any entity to whom Bank One has outsourced any of its functions or sold any of its assets or operations or any entity that offers you employment at the request of or pursuant to an agreement or arrangement with Bank One." *Id.*, p. 3. The Plan Administrator notified the plaintiffs that their applications for pay continuation benefits were denied because they were offered employment with a successor employer pursuant to an arrangement with Bank One and thus were ineligible for benefits under the terms of the Plan. The plaintiffs then instituted this suit.

The plaintiffs assert seven claims in this Cause:

First, a state common-law tortious-interference claim against RBC asserting that, by participating in the Agreement with Bank One, RBC tortiously interfered with the plaintiffs' "right to continue in employment with Bank One in a position other than the positions from which Bank One had discharged them . . . ."

Second, a state common-law restraint-of-trade claim against RBC asserting that, by the same conduct, RBC had engaged in a restraint of trade of the plaintiffs' right to freely trade and market their skills and abilities in the employment marketplace.

Third, a state statutory restraint-of-trade claim against RBC asserting that, by the same conduct, RBC had violated Indiana Code § 24-1-2-1.

Fourth, a state common-law restraint-of-trade claim against Bank One asserting that Bank One's participation in the Agreement constituted a restraint of the plaintiffs' common-law right to freely trade and market their skills and abilities in the employment marketplace.

Fifth, a state statutory restraint-of-trade claim against Bank One asserting that the same conduct violated Indiana Code § 24-1-2-1.

Sixth, a federal ERISA claim against Bank One asserting that it discharged the plaintiffs in substantial part for the purpose of denying them benefits under the Plan in violation of 29 U.S.C. § 1140.

Seventh, a federal ERISA claim against Bank One asserting that it had improperly denied the plaintiffs' claims for benefits under the Plan in violation of 29 U.S.C. § 1140. Amended Complaint, ¶¶ 15-17.

The defendants move for summary judgment on all claims. The plaintiffs cross-move for summary judgment.

**ERISA claim against Bank One for improper denial of benefits.**

Bank One contends that, because the Plan gives authority and discretion to the Plan Administrator, including unfettered discretion to interpret the terms of the Plan and make eligibility determinations thereunder, its decisions should not be reversed unless they are arbitrary and capricious or an abuse of discretion. *Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir. 1990); *Russo v. Health, Welfare & Pension Fund*, 984 F.2d 762, 765 (7th Cir. 1993). Bank One contends that Plan Administrator's denials of the plaintiffs' claims were not arbitrary,

capricious, or an abuse of discretion, and summary judgment should be entered against this claim.

The plaintiffs conceded that "under Bank One's 'Pay Continuation Plan,' the Plan Administrator was entitled to deny their claims for the severance benefit based upon the language of the Plan." (Plaintiffs' Memorandum of Authorities (doc. no. 44-2) ("Plaintiffs' Response"), p. 35). However, in responding to Bank One's argument on the plaintiffs' improper-termination claim, they alleged two instances where the Plan paid severance benefits to two division employees. The Court construes these allegations of discriminatory treatment to be directed at the arbitrariness of the Plan Administrator's denials of the plaintiffs' applications for benefits and not arguments in support of their claims of discriminatory termination.

Examination of the plaintiffs' allegations of discriminatory treatment and their factual support show no genuine dispute of material fact. In their response to Bank One's motion, the plaintiffs state that they "believe" that Bank One "accommodated Leo Liberio's 'special circumstances' while refusing to do so [*sic*] the same for Keibler," (Plaintiffs' Response, p. 37), and that Mr. Liberio "may have" received severance benefits under the Plan, (*id.*, p. 12). With regard to the plaintiffs' supervisor at Bank One, Chris Shrader, they directly assert that he received severance benefits under the Plan. (*Id.*, pp. 37 and 12). The plaintiffs cite only their own deposition testimonies as evidence. (*Id.*, p. 12).

The allegations regarding Mr. Liberio are based on Ms. Deich-Kiebler's testimony at p. 157 of her deposition and on Mr. Haber's testimony at p. 157 of his deposition. However, Ms. Deich-Kiebler testifies without qualification that she does not know what happened to Mr.

5

Liberio, whether he continued working for Bank One or whether he received a severance payment under the Plan. Similarly, Mr. Haler testified that he only "suspicioned that Leo Liberio may have received a Bank One severance, because he was not at the Chicago meeting, and I didn't see his name on the list." After undertaking discovery in this Cause, the plaintiffs neither submit nor cite to any independent documentation or other certain evidence tending to show that Mr. Liberio received severance benefits under the Plan.[1] Beliefs and suspicions do not create genuine issues of material fact.

The allegation that Mr. Shrader received severance benefits from Bank One is based on Mr. Haler's deposition testimony, during which a recording of a voice-mail message from Mr.Shrader to Mr. Haler was played in which Mr. Shrader says, in part, "By the way, I got my Bank One severance." (Haler Deposition, p. 187). During a subsequent telephone conversation between Mr. Haler and Mr. Shrader, secretly recorded by Mr. Haler, Mr. Shrader states only that he "got severance" after being terminated by RBC, without identifying the source of the payment as Bank One. (*Id.*, p. 192, 200-01). In its reply, Bank One denies that the Plan paid Mr. Shrader severance benefits, (Defendants' Reply Memorandum and Response to Cross-Motion (doc. no. 48) ("Defendants' Reply"), p. 7), but without citation to evidentiary support. However, it cites to a provision in the Agreement that required RBC, if it terminated any former Bank One employee within six months of hire, to pay severance benefits "that are no less valuable, in the aggregate"

---

[1] Although similarly unsupported by evidence, Bank One asserted in its reply that Mr. Liberio "was treated the same way as other Bank One sales employees. He was offered a job at RBC and subsequently was terminated from Bank One." (Defendants' Reply Memorandum and Response to Cross-Motion (doc. no. 48), p. 7). It does not comment on whether he received a severance payment.

than the severance benefits the former employee would have received under Bank One's Plan. Agreement, ¶ 3.02(a). Based on the date of Mr. Shrader's voice-mail message, Bank One asserts that Mr. Shrader was terminated by RBC within this six-month period and implies that Mr. Shrader must have mistakenly referred to his payment as a "Bank One severance" because it was required and calculated based on the terms of Bank One's Plan. Unfortunately, there is no affidavit or documentation from Mr. Shrader, Bank One, or RBC submitted on the present motion to confirm the source of Mr. Shrader's severance payment. Based on this record and Bank One's representations, it appears more likely that Mr. Shrader received his severance payment from RBC, not the Plan.

However, even if the payment was made by Bank One to Mr. Shrader, the plaintiffs point to no other improper severance payments made by the Plan, whether in relation to the RBC sale or otherwise. They also fail to identify any distinguishing characteristic or factor that would support an implication of discriminatory motive in favor of Mr. Shrader and against the plaintiffs. One wrong benefits decision alone does not reasonably support a claim that the Plan's earlier denials of the plaintiffs' applications — which they concede were proper based on the terms of the Plan — were arbitrary, capricious, or abuses of discretion.

The plaintiffs' allegations of discriminatory administration being rejected, it is clear that, under the terms of the Plan, RBC qualifies as a "successor employer" and that there is no dispute that it offered employment to the plaintiffs pursuant to an agreement with Bank One in relation to the division sale. Therefore, without regard to the plaintiffs' other claims, there is no genuine dispute that the Plan Administrator's denials of the plaintiffs' applications for benefits under the

Plan were not arbitrary, capricious, or an abuse of discretion and did not violate 29 U.S.C. § 1140 on these grounds.

### ERISA claim against Bank One for improper termination.

The plaintiffs assert that Bank One violated ERISA, 42 U.S.C. § 1140 which prohibits employers from, in part, discharging or discriminating against employees "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ." They assert that Bank One sold the division to RBC in order to avoid paying Plan severance benefits to the terminated employees. Assuming *arguendo* that § 1140 applies in the context of sales of ongoing business units, *see Andes v. Ford Motor Co.*, 70 F.3d 1332 (D.C. Cir. 1006); *Phillips v. Amoco Oil Co.*, 799 F.2d 1464 (11th Cir. 1986), the plaintiffs have not shown that they can prove Bank One sold the division with the specific intent to deprive the plaintiffs of their severance benefits under the Plan.

The *McDonnell-Douglass* burden shifting analysis applies to claims of ERISA discrimination. *McNab v. General Motors Corp.*, 987 F.Supp. 1115, 1125 (S.D. Ind. 1997). Assuming that the plaintiffs have stated a *prima facie* case, Bank One has asserted a neutral, non-discriminatory reason for the sale to RBC: it chose to discontinue the brokered real estate lending business for business reasons, "in order to focus company resources and efforts on more profitable direct loan products and services." Bevers Affidavit, ¶ 2. The plaintiffs rely on three facts as evidence that Bank One's proffered reason is a sham. First, the division sale resulted in only 10 of the 38 non-management former Bank One employees accepting employment with RBC, which had less-favorable benefits and business ability than Bank One. But the fact that

most of the former Bank One employees voluntarily chose not to accept RBC's offers of employment does not suggest that Bank One did not have a business purpose for the sale or that RBC's offers of employment were not genuine. There is no requirement that division sellers find buyers with equal or better benefit packages in order to avoid the implication of sham sales. To accept the plaintiffs' contention based on the difference in benefits and business prospects of RBC, the evidence would need to show that Bank One not only wanted to structure its withdrawal from the wholesale mortgage business as a division sale instead of an outright termination of employees in order to avoid severance benefits, but that it also specifically intended that its former employees end up unemployed instead of working for a successor company, and therefore Bank One looked for a company with poor prospects and benefits with whom to collude. The plaintiffs' evidence does not reasonably show such a plan and intention by Bank One.

The second evidence of sham is that Bank One "departed from its past practice of permitting employees in similar situations to take other positions within the Bank." (Plaintiffs' Response, p. 36). But the supporting evidence on which plaintiffs rely, their own experiences, do not relate to the similar situation of Bank One's sale of an ongoing business unit to a buyer wanting to continue the business with the same personnel. Again, for plaintiffs' contention of a sham transaction be accepted, there must be evidence showing that Bank One colluded with RBC in order to make a sham sale to RBC and for it to make sham offers of employment to Bank One's division employees. The plaintiffs offer no evidence that RBC's asserted business desire to continue the wholesale mortgage business with the experience and contacts of the existing Bank One employees was a sham.

The third piece of evidence the plaintiffs propose to show that Bank One's proffered business reason for the sale of the division is a sham is that the sale saved the Plan millions of dollars in severance payments. But this is only the outcome of the sale of which the plaintiffs complain; it is the subject matter on which evidence of specific intent is sought.

Because the plaintiffs have not shown that Bank One's proffered business reason for selling the division as an ongoing concern is pretextual, they cannot satisfy the *McDonnell-Douglass* burden-shifting analysis and have not shown a genuine issue of material fact. Bank One is due judgment as a matter of law on the plaintiffs' ERISA claim for discriminatory denial of benefits.

**ERISA preemption of state law claims.**

Bank One argues that the plaintiffs' state law claims of tortious interference and restraint of trade are preempted by ERISA because the plaintiffs are primarily concerned about receiving benefits under the Plan and their claimed damages, described in terms of the plaintiffs' lost pay and benefits, would require interpretation of the Plan's terms to determine eligibility and permit the calculation of benefits. In their state-law claims, the plaintiffs do not challenge Bank One' sale of the division to RBC or the Plan's denial of severance benefits to them; instead, they challenge only the provision of the sale whereby Bank One agreed to not employ or solicit the former division employees for a period of six months. Whether that provision violates the state's tortious-interference or restraint-of-trade laws can be determined without interpretation of the terms of the Plan and without reference to the existence of the Plan. While the plaintiffs do seek the value of their severance and other Plan benefits as damages, they have also pled direct

ERISA claims which support such damages.  Whether the plaintiffs may obtain the value of their severance benefits as damages in their state claims, and whether this invokes ERISA preemption, need not be decided for the purposes of the present motion.

**Tortious interference claim against RBC.**

The plaintiffs claim that RBC tortiously interfered with their prospect of continued employment with Bank One.  The elements of a tortious-interference claim in Indiana are:  (1) a valid and enforceable contract; (2) defendant's knowledge of that contract; (3) defendant's intentional inducement of breach of that contract; (4) the absence of justification; and (5) damages resulting from the breach.  *Winkler v. V. G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994).  The plaintiffs do not assert that RBC's "inducement" of Bank One to terminate them was tortious — and *Winkler* itself dooms such a contention on the business-justification element.  Instead, they complain only about the no-hire clause:  they contend that RBC tortiously induced Bank One to agree to not employ or solicit the plaintiffs for six months and thereby interfered with the plaintiffs' rights to continued or future employment with Bank One.

A hope or a desire for continued or new employment, however, is not a valid and enforceable contract especially in Indiana's employment-at-will regime.  The plaintiffs do not dispute the defendants' assertion that a major part of the division's value as an asset — what made it attractive to a buyer — was the likelihood of the division's employees continuing with the buyer.  Bank One therefore had an independent incentive and purpose for not retaining the division's employees and not rehiring them for a period of time.  The plaintiffs do not allege or show that, but for the formal no-hire provision, Bank One would have continued to employ them

11

or would have rehired them before expiration of the exclusion period. They point to previous transfers and retentions of employees as Bank One made business changes, but none of those instances involved the intact sale of an ongoing division. Furthermore, under *Winkler*, there is no doubt that such an agreement is justifiable on the same business-judgment reasons upheld in that case. The plaintiffs do not contradict the defendants' evidence that Bank One intended to discontinue the wholesale mortgage division for business reasons in order to concentrate on more profitable endeavors, that RBC wanted to enter the same business by purchasing Bank One's division, and that RBC desired to retain Bank One's experienced employees in order to improve its business prospects for a smooth transition and an efficient and profitable operation. Because the plaintiffs have not shown that they can establish the "valid and enforceable contract" and "absence of justification" elements of a tortious interference claim, summary judgment should be entered against the claim.

### Restraint of trade claims against Bank One and RBC.

The plaintiffs assert restraint-of-trade claims under both statute, Ind. Code § 24-1-2-1, and common-law. Because Indiana Code § 24-1-2-1, which prohibits "[e]very scheme, contract, or combination in restraint of trade or commerce," is patterned after the federal Sherman Antitrust Act, *Tilbury v. City of Fort Wayne*, 471 N.E.2d 1183, 1185 (Ind. App. 1984); *Orion's Belt, Inc. v. Kayser-Roth Corp.*, 433 F.Supp. 301, 302-03 (S.D. Ind. 1977), courts refer to the federal statute and interpretations thereunder to inform their interpretations of the Indiana act, *id.*; *Fuller v. Town of Vevay*, 713 N.E.2d 318, 322 (Ind. App. 1999); *Agmax, Inc. v. Countrymark Cooperative, Inc.*, 795 F.Supp. 888, 891 (S.D. Ind. 1992). Accordingly, one of the elements that must be shown for the maintenance of an anti-trust or restraint-of-trade claim federally and at

Indiana law is antitrust injury or competitive harm. Because the plaintiffs candidly admit that they cannot show this competitive harm element, (Plaintiffs' Response, p. 31-32), their statutory restraint-of-trade claim is doomed.

At common law, Indiana courts have upheld covenants not to compete against common-law restraint-of-trade claims, particularly in the context of sales of a business. *See*, *e.g.*, *Fogle v. Shah*, 539 N.E.2d 500 (Ind. App. 1989). The plaintiffs concede that "[i]t is true that the RBC-Bank One agreement that is at issue in this case is a form of a covenant not to compete," (Plaintiffs' Response, p. 33), but they assert that the law respecting such covenants do not apply to them because they did not consent to the Agreement; the Agreement is between only RBC and Bank One and only they are bound by the covenants. The plaintiffs' argument is futile. Under Indiana law, three factors are examined in evaluating the enforceability of a covenant not to compete:

> (a) whether the covenant is broader than necessary for the protection of the covenantee . . . in some legitimate interest, (b) the effect of the covenant upon the covenantor, . . . and (c) the effect of the covenant upon the public interest. Of primary importance is the question of . . . whether it is reasonable as to time, space and the activity restricted.

*Fogle*, 539 N.E.2d at 503. Thus, the effect on the public interest of restricting an individual's ability to freely compete with his services is part of the analysis of the legality of covenants under Indiana's common law and Indiana courts have decided that, in some instances, particularly in the context of sales of businesses, the public interest permits restrictions on individuals' rights to market their services and companies' rights to freely hire. If Bank One hired the plaintiffs in contravention of the Agreement's no-hire provision, and the covenant were held enforceable at law, then RBC would be able to enforce the provision against Bank One,

13

preventing its hire of the plaintiffs, regardless of the plaintiffs' desire to freely market their services or to be employed by Bank One.

The defendants contend that the no-hire provision is an enforceable covenant under Indiana common law based on the *Fogle* test and cite persuasive authority in support. The plaintiffs attempt no showing or argument on the *Fogle* factors and do not even suggest that the Bank One-RBC no-hire provision is unreasonable as to time, place, or manner. The plaintiffs' sole argument on their common law restraint-of-trade claim was legal: that Indiana's doctrine that properly-limited non-compete covenants do not illegally restrain trade does not apply to the Bank One-RBC Agreement. Having found against them on this point, the Court concludes that the plaintiffs have not shown that their common-law restraint-of-trade claims can be sustained.

## Conclusion.

There is no genuine issue of fact that is material to the plaintiffs' claims and the defendants have shown that they are due judgment as a matter of law on all of the plaintiffs' claims. Therefore, the defendants' motion for summary judgment is **GRANTED** and the plaintiffs' cross-motion for summary judgment is **DENIED**. A separate judgment order will issue.

IT IS SO ORDERED.

Date: 09/30/2005

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copy to:

Samuel G. Hayward
Adams, Hayward & Welsh
samuelghayward@hotmail.com

Dustin E. Meek
Tachau Maddox Hovious & Dickens, PLC
dmeek@tmhd.com